IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:19-cv-77

DAVID DONOVAN,            )
                          )
        Plaintiff,        )
                          )
    v.                    )
                          )                **COMPLAINT**
                          )
NCI BUILDING SYSTEMS, INC, NCI )            **JURY TRIAL DEMANDED**
GROUP, INC, CENTRIA       )
ARCHITECTURAL SYSTEMS, and )
CENTRIA, INC.,            )
                          )
        Defendants.       )

## I.     INTRODUCTION

1. Plaintiff David Donovan ("Plaintiff" or "David") worked at NCI Building Systems, Inc., NCI Group, Inc., Centria Architectural Systems, and Centria, Inc. (collectively, the "Company" or "Defendants") for thirty-eight years before the Company had him put his belongings into a cardboard box and threw him to the curb. During his almost unimaginably long career with the Company, David amassed awards and achievements that earned him respect throughout his industry. He was incredibly talented and loyal to a fault. David loved the Company, and the Company loved and valued him back.

2. And then bias reared its ugly head. David was diagnosed with multiple sclerosis in 2004. For almost ten years, David's disability went unnoticed. But in 2013, when he was 56-years-old, David's multiple sclerosis forced him to walk with a cane. His co-workers and supervisors quickly took note, and word of David's mobility issue quickly spread throughout

the office. David was incrementally stripped of his job duties and sidelined from the Company's most important work.

3. In or around March 2017, David was diagnosed with trigeminal neuralgia—an extremely painful disorder that affects the trigeminal nerve on the side of the face. David let his supervisor know he may not be able to make an April trade show. Though he later told his supervisor his health had improved and he could attend afterall, he was barred from going anyway. His supervisor never forgave him for this health failing. In August 2017, David had further health setbacks when he needed emergency eye surgery. Defendants had enough of David's health issues.

4. In or around March 2016, the Company gave David's main duties to Charles Schaeffer, who was in his early 30s. On or around March 1, 2017, the Company hired Kim Rager to take over for Charles Schaeffer. She was around 33-years-old at the time. Her previous background revolved around coatings, but, rather than slot her into the coatings role and give David his Insulated Metal Panels (IMP) duties back, the Company was determined to give her IMP to David's detriment. In August 2017 it hired Stephen Ploszay, who was around 33 years-old. Even though the Company had just hired his Mr. Ploszay, it fired David on September 21, 2017, and had the gaul to tell him that it was a "job elimination."

5. The Company didn't eliminate David's position. It fired him on the basis of his age and/or his real or perceived disabilities. David now brings this action against Defendants for wrongful discharge in violation of North Carolina public policy ("WDPP") (Count I), violations of the Americans with Disabilities Act ("ADA") ("Count II"), violations of the Age

Discrimination in Employment Act ("ADEA") ("Count III"), and violations of the Family Medical Leave Act ("FMLA") ("Count IV").

## II. PARTIES, JURISDICTION AND VENUE

6. Plaintiff is a resident of Mecklenburg County, North Carolina.

7. NCI Building Systems, Inc. is a Delaware corporation, headquartered in Texas, with its North Carolina registered office located at 212 South Tryon Street, Suite 1000, Charlotte, North Carolina 28281.

8. NCI Group, Inc. is a subsidiary of NCI Building Systems, Inc. It is a Delaware corporation, headquartered in Houston, Texas.

9. In January 2015, NCI Building Systems, Inc. acquired Centria Architectural Systems, which was was incorporated and based in Pennsylvania.

10. Centria, Inc. is a Delaware corporation, headquartered in Texas, with its North Carolina registered office located at 212 South Tryon Street, Suite 1000, Charlotte, North Carolina 28281.

11. Plaintiff worked for NCI Building Systems, Inc., NCI Group, Inc., Centria Architectural Systems, and Centria, Inc. (collectively, "Defendants" or the "Company") at 10801 Johnston Road, Charlotte, North Carolina 28226.

12. Venue is proper in the Charlotte Division of the Western District of North Carolina because: (a) Defendants' unlawful employment practices were committed in Mecklenburg County, North Carolina; (b) Plaintiff would have worked in Mecklenburg County, North Carolina but for Defendants' unlawful employment practices; (c) Defendants reside in Mecklenburg County, North Carolina because they are subject to the Court's personal

jurisdiction there in light of the business they transact in Mecklenburg County and elsewhere in the Western District of North Carolina; and (d) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Mecklenburg County, North Carolina and elsewhere in the Western District of North Carolina.

### III. FACTUAL STATEMENT

13. David was born on March 15, 1957, in Pittsburgh, Pennsylvania and went to high school in Bethel Park, Pennsylvania.

14. After high school, David went to Penn State University in State College, Pennsylvania. There, he studied Facility Planning and Architectural Engineering. He graduated in 1979. After graduation, in or around October 15, 1979, the Company hired David as a Sales Engineer.

15. David was always one of the Company's highest achievers. He was in the President's Club every year since its inception, which was around 1996. To be in the President's Club, employees had to sell their quota and meet all of the Company's goals. Only the best employees got in, and David made it every year.

16. Until October 2015, David worked for the Company as a District Sales Manager. He then became Product Manager for Insulated Metal Panels and Coatings.

17. On or around March 12, 2004, David's physician diagnosed him with multiple sclerosis. The news was devastating for David and his family, but he soon realized that he could continue with his career, and that his cognitive function would remain intact. It would be difficult, and the future was less certain, but David would persevere. And that's exactly what he did.

18. However, over time, starting in or around June 2013, David's MS required that he begin walking with a cane.

19. At a District meeting, in or around September 1, 2014, Interim President Joel Mazur saw David walk with a cane for the first time. Defendants started treated him differently overnight.

20. In early 2015, the Company suddenly wanted to take David out of his Sales Territory, and it constantly pressured him to voluntarily give it up. At that point, David and his wife had enough. They said that the "discrimination" had to stop.

21. In September 2015, the Company hired Preston Bowen. Preston Bowen was roughly 10 years younger than David, and he came onboard to be President of Centria.

22. The Company moved David into a Product Management job, in or around October 5, 2015, and forced him to give up his territory to Doug Hileman—in his early 30s at the time.

23. David began reporting to Director of Product Management Greg Lusty in or around October 2015. In or around May 2015, Jeff Peskowitz began working for the Company as a Product Manager of Rain Screen Systems. Peskowitz would eventually become David's supervisor in March 2017 when Lusty left the Company.

24. David performed well in his new role. He developed a new AIA program and helped at the plants and also trained salesmen.

25. On or around February 1, 2016, David made a trip to Pittsburgh, Pennsylvania. There, he learned that the Company was realigning its Marketing Department of four people.

26. In March 2016, the Company took Foam IMP away from David, leaving him with just coatings and paints. The Company gave IMP to Charles Schaeffer, who was in his early 30s at the time.

27. Meanwhile, David was asking for more responsibility. He had been with the Company for 37 years—longer than these peers had been alive—and he wanted his talents and experience to be put to good use. Instead, the Company cast him aside.

28. In November 2016, Lusty gave David the worst review of his career. Many of the issues raised in the review were blatantly out of David's control—like a third-party vendor being late on a deliverable—but Lusty pushed forward anyway, even after David tried to explain what had happened.

29. In December 2016, the Company promoted Peskowitz to Manager of Product Managers. He became David's direct supervisor in March 2017 when Lusty left the Company.

30. In January 2017, Schaeffer left, so David asked if he could have his old IMP role back. Lusty told him that the Company could not give him that role and that he wanted David to stick with the coatings, despite David's unrivaled expertise with IMP.

31. In or around March 2017, David was diagnosed with trigeminal neuralgia. This is a disorder that affects the trigeminal nerve on the side of the face. It can be extremely painful, and it often produces quick bursts of intense pain that quickly dissipate.

32. At around that same time, David knew that the AIA Trade Show was coming up in April 2017, and he also knew that his medical condition would likely prevent him from going. Therefore, he told Peskowitz that he likely wouldn't be able to go. He told David in

6

Case 3:19-cv-00077-RJC-DCK   Document 1   Filed 02/14/19   Page 6 of 15

response, "You are highly compensated and you should be at these kinds of shows." Prior to this, David had never missed a trade show.

33. At around that same time, David's health improved, so he told Peskowitz that he could go to the trade show in April. Peskowitz said no.

34. On or around March 1, 2017, the Company hired Kim Rager, and she took over IMP. She was around 33-years-old at the time. Her previous background at PPG revolved around coatings, but, rather than slot her into the coatings role and give David his IMP duties back, the Company was determined to give her IMP to David's detriment.

35. During the summer of 2017, as he had been doing since March 2016, David constantly asked the Company for more responsibilities. The Company kept telling him to just learn more about coatings.

36. In or around August 2017, the Company hired Stephen Ploszay as a Product Manager of Rain screens. At the time of his hire, Ploszay was roughly 33-years-old.

37. David's medical issues continued to pile up. In August 2017, he began noticing that he was having difficulty seeing signs while driving. After speaking with his wife, David visited a physician, who detected that David had a torn retina in his eye that required emergency surgery.

38. On or around August 28, 2017, David took off of work for his surgery. It was the only day of work that he had missed in his 38 years with the Company. He let Peskowitz know that he had a torn retina, and needed the day off. Peskowitz agreed.

39. Coming off of surgery for his torn retina, and feeling exhausted from his multiple sclerosis and trigeminal neuralgia, David's physician was urging him to take some time off of work to recover and rest.

40. To that end, on or around September 21, 2017, David followed the Company's procedures and submitted paperwork for a Family Medical Leave Act protected medical leave.

41. Later that same day, on September 21, 2017, Peskowitz called David into a meeting and fired him. HR Director Matt Zollo accompanied Peskowitz. Even though the Company had just hired Ploszay, they told David that the Company had decided to eliminate his position. After 38 dedicated years, the Company showed David the door.

42. Plaintiff's wife picked him up from the office and saw Plaintiff coming out. Zollo and Peskowitz were carrying boxes of Plaintiff's belongings. Plaintiff and his wife challenged Defendants' claim of "job elimination" and called them out for firing Plaintiff because of his disability before leaving. Plaintiff said they would fight this termination.

43. But the Company was all that David knew, and he wanted to stay there. He applied for a Regional Distribution Manager job, for which he was extremely qualified, in October 2017. David knew the products and customer-base better than anyone. However, HR Director Matt Zollo quickly rejected him. Upon information and belief, the Company did not fill that position until March 2018.

44. On or around February 22, 2018, David filed an EEOC Charge of Discrimination with the Equal Employment Opportunity Commission. On March 15, 2018, David filed an Amended EEOC Charge with the EEOC. On or around November 16, 2018, the EEOC

issued David a Right to Sue letter, which he received days later. This Complaint is timely filed within 90 days of David's receipt of the Right to Sue letter.

45. To add insult to injury, during the EEOC process, David learned that, upon information and belief, Peskowitz clandestinely put a "does not meets" May 2017 performance review in David's personnel file. However, David never saw this review during his employment with the Company. During his long career, David physically signed his reviews and even had space to enter comments. The May 2017 review, on the other hand, bears an electronic signature that, upon information and belief, was added by the Company to justify firing David.

## IV. LEGAL CLAIMS

### Count I
*(Wrongful Discharge in Violation of Public Policy)*
*Against All Defendants*

46. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

47. Plaintiff was an at-will employee of Defendants.

48. Defendants employed at least fifteen (15) employees at all relevant times.

49. Defendants violated the public policy of North Carolina as set forth in N.C.G.S. § 143-422.1 (North Carolina's Equal Employment Practices Act) by terminating Plaintiff because of his age.

50. The public policy of North Carolina, codified in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2(a), seeks to protect and safeguard the opportunity and right of all individuals to "seek, obtain, and hold employment without

discrimination" on the basis of disability or "handicap." Defendants violated the public policy of North Carolina by terminating Plaintiff on the basis of his disability (or "handicap"). Defendants further violated the public policy of North Carolina by terminating Plaintiff because Defendants regarded Plaintiff as having a physical or mental impairment which substantially limits one or more major life activities.

51. Plaintiff qualified as an individual with a disability in that he was actually disabled/handicapped and was perceived as such.

52. Defendants violated North Carolina public policy by terminating Plaintiff because of his actual or perceived disability and/or handicap.

53. As an actual, proximate, and foreseeable result of Defendants' actions, Plaintiff has suffered lost back and front pay, lost benefits, diminution in his earning capacity, severe emotional distress, damage to his reputation, anxiety, depression, embarrassment, humiliation, and his peace of mind has been disturbed.

54. Defendants' actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendants' officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages.

### Count II
*(Violation of the Americans with Disabilities Act)*
*Against All Defendants*

55. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

10

Case 3:19-cv-00077-RJC-DCK   Document 1   Filed 02/14/19   Page 10 of 15

56. Defendants regularly employed more than fifteen employees at all relevant times.

57. Plaintiff was disabled in that he had physical impairments that substantially limited one or more major life activities, including but not limited to: stand, walk, work, and perform physically enduring tasks for a certain period of time. Plaintiff's condition limited the following major life activities and/or bodily functions: vision, sleeping, standing, lifting, communicating, and working.

58. Plaintiff's disability also affected his nervous and muscular systems.

59. Defendants otherwise regarded Plaintiff as disabled at the time of his termination and in the lead up to Plaintiff's termination.

60. Plaintiff suffered an adverse employment action when Defendants terminated his employment on the basis of his real or perceived disabilities and/or in retaliation for receiving or requesting a reasonable accommodation (medical leave).

61. Defendants also violated the ADA when they refused to hire Plaintiff when he applied for the Regional Distribution Manager job on the basis of his real or perceived disabilities and/or in retaliation for engaging in protected activity.

62. As an actual, proximate, and foreseeable result of Defendants' actions, Plaintiff has suffered lost back and front pay, lost benefits, severe emotional distress, severe physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and his peace of mind has been disturbed.

63. Defendants' actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendants' officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct

alleged above. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages.

## Count III
*(Violation of the Age Discrimination in Employment Act)*
*Against All Defendants*

64. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

65. Plaintiff is, and at all relevant times was, an employee covered by the protections of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et. seq.* ("ADEA").

66. Defendants employed at least 20 employees and was engaged in commerce at all relevant times.

67. Plaintiff was a 60-year-old employee at the time of his termination.

68. Plaintiff was qualified for his position at all relevant times. Defendants treated Plaintiff disparately in relation to his similarly situated peers that were under the age of 40 and/or significantly younger than Plaintiff.

69. Defendants otherwise exhibited age bias by, but not limited to, explicitly seeking to employ a younger workforce and fostering a culture that valued younger employees at the expense of older workers.

70. Defendants replaced Plaintiff with a significantly younger employee.

71. Defendants' explanations for Plaintiff's termination amount to pretext for unlawful age discrimination.

72. Defendants violated the ADEA when it terminated Plaintiff's employment on the basis of his age and/or because of his opposition to age discrimination.

73. Defendants also violated the ADEA when they refused to hire Plaintiff when he applied for the Regional Distribution Manager job on the basis of his age and/or in retaliation for engaging in protected activity.

74. As an actual, proximate, and foreseeable result of Defendants' actions, Plaintiff has suffered lost back and front pay, lost benefits, severe emotional distress, severe physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and his peace of mind has been disturbed.

75. Defendants' actions were done willfully and in a manner that demonstrates a reckless disregard for Plaintiff's rights under the ADEA. As a result of Defendants' conduct, Plaintiff is entitled to recover liquidated damages.

### Count IV
*(Violation of the Family Medical Leave Act)*
*Against All Defendants*

76. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

77. Plaintiff required leave protected under the Family and Medical Leave Act because of his own serious health condition. Plaintiff was employed by Defendants for 12 months and worked at least 1,250 hours during the 12 months prior to the start of his requested leave. Defendants employ 50 or more employees within a 75-mile radius pursuant to 29 C.F.R. §825.111.

78. Plaintiff was entitled to FMLA leave. Defendants' decision to immediately terminate Plaintiff the day he requested FMLA leave interfered with his right to take FMLA leave. Defendants' action was related to the attempted exercise of Plaintiff's FMLA rights.

79. Plaintiff engaged in protected activity by requesting FMLA leave and by otherwise alerting Defendants to his need to take time off because of his own serious health condition. Defendants took an action that a reasonable employee would have found materially adverse. There exists a causal connection between Plaintiff's protected activity and Defendants' adverse action.

80. Defendants replaced Plaintiff with an employee that did not need FMLA leave.

81. Defendants' explanations for Plaintiff's termination amount to pretext for unlawful discrimination, retaliation, and interference.

82. Defendants violated the FMLA when it terminated Plaintiff's employment because of his request for time off because of his own serious health condition.

83. Defendants also violated the FMLA when they refused to hire Plaintiff when he applied for the Regional Distribution Manager job.

84. As an actual, proximate, and foreseeable result of Defendants' actions, Plaintiff has suffered lost back and front pay, lost benefits, severe emotional distress, severe physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and his peace of mind has been disturbed.

85. Defendants' actions were not in good faith. Nor did Defendants have objectively reasonable grounds to believe they were not violating the FMLA. Defendants' actions were done willfully and in a manner that demonstrates a reckless disregard for Plaintiff's rights under the FMLA. As a result of Defendants' conduct, Plaintiff is entitled to recover liquidated damages

# JURY TRIAL DEMANDED

WHEREFORE, the Plaintiff prays the Court to:

1. Enter a judgment against Defendants and order Defendants to pay Plaintiff compensatory damages in an amount to be determined at trial;

2. Award Plaintiff punitive damages pursuant to N.C. GEN. STAT. § 1D-1 *et seq.*;

3. Award Plaintiff liquidated damages under 29 U.S.C. § 626(b);

4. Award Plaintiff liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii);

5. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

6. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances; and

7. Grant Plaintiff a trial of this matter by a jury.

This the 14th day of February, 2019.

*/s/ Sean F. Herrmann*
Sean F. Herrmann
North Carolina Bar No. 44453
Kevin P. Murphy
North Carolina Bar No. 41467
Herrmann & Murphy, PLLC
1712 Euclid Avenue
Charlotte, North Carolina 28203
Phone: 704-940-6399
Fax: 704-940-6407
Email: sean@herrmannmurphy.com
Email: kevin@herrmannmurphy.com

*Attorneys for Plaintiff*